UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| THOMPSON CORRUGATED SYSTEMS, INC. and THOMPSON CORRUGATED SYSTEMS LLC,<br><br>      Plaintiffs,<br><br>  v.<br><br>ENGICO S.R.L.,<br><br>      Defendant. | Case No. 20-cv-122-JPG |

**MEMORANDUM AND ORDER**

This matter comes before the Court on cross motions for summary judgment filed by defendant Engico S.r.l. (Doc. 71) and by plaintiffs Thompson Corrugated Systems, Inc. ("Thompson Inc.") and Thompson Corrugated Systems LLC ("Thompson LLC") (collectively, "TCS") (Doc. 77). The parties have responded and replied to the respective motions.

This case arises out of a relationship between Engico and the plaintiffs that began in 2002 and went south in 2019. The plaintiffs allege that in 2004 Engico agreed in an oral agreement that Thompson Inc. and the predecessor to Thompson LLC would jointly be the exclusive sales representative for Engico's products—machinery to produce corrugated materials—in North America, and that they would be paid on commission. The relationship was terminated in 2019, and the current dispute is about whether Engico failed to pay the plaintiffs commissions on sales made around the time the relationship soured. It is indisputable that Engico owes at least one commission to TCS, and there is a genuine issue of material fact as to the two others in issue.

**I.    Summary Judgment Standard**

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the nonmoving party carries the burden of proof at trial, the moving party may satisfy its burden of production in one of two ways. It may present evidence that affirmatively negates an essential element of the nonmoving party's case, *see* Fed. R. Civ. P. 56(c)(1)(A), or it may point to an absence of evidence to support an essential element of the nonmoving party's case without actually submitting any evidence, *see* Fed. R. Civ. P. 56(c)(1)(B). *Celotex*, 477 U.S. at 322-25; *Modrowski*, 712 F.3d at 1169. Where the moving party fails to meet its strict burden, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322-26; *Anderson*, 477 U.S. at 256-57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-

minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252.

## II.     Facts

The main dispute in this case is whether there was an enforceable sales representative agreement between Engico and TCS and, if so, what the terms of that agreement were.  In their cross-motions for summary judgment, the parties agree on a number of facts but disagree on the legal implications of those facts.  The Court notes their disagreements as it sets forth the following relevant facts.

Engico is an Italian company that manufactures machinery to produce corrugated materials such as cardboard boxes.  In 2002, having never sold its machines in North America and having no North American sales representative, Rinaldo Benzoni, Engico's founder and managing director, began discussions with Fred Thompson Sr. ("Thompson Sr."), Thompson Inc.'s president, about TCS's becoming Engico's North America sales representative.  Thompson's son, Fred Thompson II ("Thompson II") was the owner of Thompson LLC (and its predecessor corporation).

Over the following years, the parties exchanged written proposals for an exclusive manufacturer's representative agreement, but they never signed a written agreement.  Although there was no written agreement, in 2004 the parties entered into an oral agreement that TCS would be Engico's exclusive North American sales representative and that Engico would pay it a commission for the sales.  TCS contends the commission upon which they agreed was 8% after transportation and installation costs.  Benzoni contends there was no agreement reached on a specific commission rate, but that Engico was still exploring the North American market and that any commissions would depend on the circumstances of the individual sale and would be

3

determined at the time the sale price was being negotiated with the prospective customer.

There is no dispute that the oral agreement did not expressly address the question of termination or specific residual commissions after termination of the arrangement. Benzoni testified that, as a practical matter, TCS was Engico's only sales representative in the United States, although that was because Engico never engaged another representative until 2019, not because they agreed to exclusivity. Thompson Sr. testified that the agreement included the Manufacturers' Agents National Association ("MANA") Code of Ethic, but Benzoni testified that, although he received a copy of the document, he never read it or agreed to it.

Subsequently, TCS promoted Engico's machinery and procured a sale of an Engico machine to Lawrence Paper Company in October 2005. After the sale, TCS sent Engico an invoice for an 8% commission, which Engico paid without objection.

In February 2011, Engico informed TCS that because of the economic downturn, it needed to change the commission rate to a sliding scale going forward. In 2012, the parties discussed a commission structure where TCS would be paid 6% for the first million euros of the sales price, 5% for the next million, 4% for the next million, and 3% for anything exceeding three million euros. Thompson Sr. recalls that this sliding scale was agreed upon for the next three sales. Benzoni testified that was the agreement but also that the commission would be determined on a case by case basis. Again, Benzoni does not believe there was a firm commitment to this particular sliding scale, but TCS contends that Engico agreed to start with this commission structure and see how it worked.

In October 2016, since TCS had not procured a sale since 2005, Engico told TCS that the relationship would terminate. Nevertheless, the parties continued discussions and in January 2017 again tried to formalize the relationship in a written agreement. Again, they were

unsuccessful, and no written agreement was formed.

On December 22, 2017, Engico sold a machine to Jayhawk Boxes, Inc., an affiliate of Lawrence Paper, the 2005 purchaser of an Engico machine.  Engico paid TCS a commission consistent with the sliding scale the parties had discussed in 2012.

In early 2018, Benzoni and TCS agreed to maintain the sales representative relationship until Thompson Sr. retired, which he planned to do at the end of 2021.  Nevertheless, Thompson Sr.'s failing health and Benzoni's concerns that Thompson II would not be an acceptable partner in the relationship caused Engico to reconsider that timeline.

In 2019, Lawrence Paper contacted Engico directly to purchase another machine.  Even though TCS had brought Lawrence Paper to Engico as a customer in 2005 and developed it as a client since then, at Engico's request, TCS did not work on the specific transaction in 2019.  Engico sold the machine to Lawrence Paper on May 10, 2019, and informed TCS of the terms of the sale, but did not pay TCS a commission at the time.  Had the sliding scale discussed in 2012 been in place, the commission would have been € 180,000.

In the summer of 2019, Engico again informed TCS that it intended to terminate the relationship as of January 1, 2020.  At Engico's request, TCS gave Engico a list of potential customers for Engico's machinery along with its estimate of the likelihood of completing each sale.  Benzoni testified that he was willing to pay commissions on those sales if they happened before January 1, 2020.  One of those potential customers was Welch Packaging, which was interested in buying the used machine Lawrence Paper had originally purchased in 2005.

At a subsequent meeting on August 7, 2019, Benzoni informed Thompson Sr. that Engico was terminating the relationship and engaging the Haire Group as its United States representative.  Benzoni gave TCS the opportunity to work with the Haire Group for the rest of

the year to ensure a smooth transition.  Benzoni states that Engico offered TCS a commission on the May 2019 sale to Lawrence Paper to be paid once Lawrence Paper started paying Engico, but TCS refused to accept the commission.  Benzoni testified that the commission Engico offered comported with the sliding scale discussed in 2012:  6% for the first million euros, 5% for the next million, 4% for the next million, and 3% for anything beyond that.  On the other side, Thompson Sr. claims Benzoni said no commission would be paid because TCS was not involved in the sale.  Thompson Sr. left the meeting, and no further commissions were discussed.  A subsequent letter to Thompson Sr. offered a reduced commission.

In a letter dated September 10, 2019, Engico advised TCS that their relationship would terminate on December 31, 2019, and that until that time, Haire would also serve as Engico's North American sales representative.  The letter also offered a reduced commission on the Lawrence Paper sale and any other sales concluded before December 31, 2019.

The following month, on October 30, 2019, Engico sold a machine to President Container Group; TCS played no role in developing that client or in directly procuring that sale.  Early in January 2020, Engico sold a used machine to Haire, which had arranged three days earlier to sell it to Welch Packaging.  The used machine was shipped directly from Lawrence Paper to Welch Packaging.  Welch Packaging was one of the potential customers TCS had identified in the summer of 2019; President Container was not.  Had the sliding commission scale discussed in 2012 been observed, the commissions for the President Container and Haire/Welch Packaging sales would have been € 192,000 and € 70,000, respectively.

TCS filed this lawsuit on January 30, 2020, to recover commissions they believed Engico owes them.  Count I is a claim for breach of contract; Count II is for violation of the Illinois Sales Representative Act ("IRSA"), 820 ILCS 120/0.01 *et seq.*; Count III is for an accounting;

and Count IV, pled in the alternative, is a claim for unjust enrichment. Engico denies that there was ever an enforceable contract for which commissions would be due.

**III. Analysis**

Because the Court is hearing this case under its diversity jurisdiction, *see* 28 U.S.C. § 1332(a), whether there was an enforceable contract and what the terms of any such contract were are governed by state substantive law. *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)). All parties cite to Illinois substantive contract law, so the Court assumes that law applies. The Court therefore applies relevant decisions of the Illinois Supreme Court, and if it has not spoken on the issue, the Court predicts how it would rule using decisions from the Illinois Appellate Courts as guidance. *Straits Fin. LLC v. Ten Sleep Cattle Co.*, 900 F.3d 359, 369 (7th Cir. 2018).

  A. <u>Enforceability of Oral Contract</u>

One fundamental principle of Illinois law that appears to escape Engico is that, generally, an oral contract is just as enforceable as a written contract as long as there is an offer and acceptance and a meeting of the minds about the terms of the agreement. *Quinlan v. Stouffe*, 823 N.E.2d 597, 603 (Ill. App. Ct. 2005) (citing *Lampe v. O'Toole,* 685 N.E.2d 423, 424 (Ill. App. Ct. 1997)). Thus, unless the law requires a writing, the failure of parties to execute a written instrument memorializing their agreement will not prevent enforcement of the agreement if it is otherwise a valid contract. It is true that the lack of a writing makes the terms more difficult to prove, but it will not, by itself, render the agreement unenforceable.

  B. <u>Meeting of the Minds</u>

The parties first dispute whether there was an agreement, that is to say, a meeting of the

7

minds about what the terms of an agreement were.  As noted above, an enforceable contract requires a meeting of the minds, that is, mutual assent to the terms of the contract.  *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61, 65 (Ill. 1987).  However, "it is not necessary that the parties share the same subjective understanding as to the terms of the contract."  *Id.* (citing 1 S. Williston, Contracts §§ 21 & 22 (3d ed. 1957)).  It is enough if their objective conduct indicates an agreement to the terms.  *Midland Hotel*, 515 N.E.2d at 65.  "Otherwise, a party would be free to avoid his contractual liabilities by simply denying that which his course of conduct indicates.  As such, [a party's] subjective understanding of the terms of the contract is immaterial."  *Id.*  A clash of subjective understandings is not sufficient to create an issue of fact for the jury because "the focus under Illinois law is on the *conduct* of the parties and whether that conduct objectively manifested assent to an agreement."  *Baker v. Elmwood Distrib., Inc.*, 940 F.2d 1013, 1017 (7th Cir. 1991) (citing *Midland Hotel*, 515 N.E.2d at 65; 12 Illinois Law and Practice *Contracts* § 9 (West 1983); Restatement (Second) of Contracts § 19 (1981)).

While Engico admits that in 2004 there was an oral agreement that TCS would be its exclusive North American sales representative in exchange for sales commissions, it points to the parties' varying testimony over the amount of the sales commissions.  Engico says they agreed to provide a commission, although the amount was not determined and remained at Engico's discretion depending on the circumstances of the sale.  On the other side, TCS says they agreed to 8% and later agreed to change to a sliding scale.

The parties' conduct evidences an agreement over which the minds met.  TCS promoted Engico's machines and procured a sale to Lawrence Paper in 2005, and Engico paid TCS an 8% commission for that sale without further negotiation or discussion.  Additionally, the parties

agreed to a change in 2012 to a sliding scale; a "change" would not have been necessary had there not been a set rate already established.  And then, again without further negotiation or discussion, Engico paid TCS a commission for the 2017 Jayhawk Boxes sale based on the sliding scale discussed in 2012 and, according to Benzoni, offered the sliding scale commission on the 2019 Lawrence Paper sale.  A reasonable jury could look at this conduct and conclude that there was a meeting of the minds in 2004 that Engico would pay TCS a commission of 8% and again in 2012 that the commission would be based on a sliding scale for at least the next three sales.  Engico is not entitled to summary judgment on the theory that there was no meeting of the minds with TCS.

Indeed, the evidence is such that a reasonable jury could *only* conclude that TCS and Engico agreed at first to an 8% commission, then to a sliding scale.  Their subjective difference of opinion notwithstanding, that is how they objectively behaved, and Illinois law says their behavior is what counts.  No reasonable jury could find the terms of the agreement any different.  Therefore, TCS is entitled to summary judgment on the question of whether there was a meeting of the minds about the percentage of commission governing the relationship.

    C.    <u>Definite and Certain Terms</u>

Engico further argues that any agreement it had with TCS is too indefinite and uncertain to be enforced because it did not contain specific essential terms usually found in sales representative agreements:  which plaintiff was owed a commission, the duration of the agreement, termination provisions, post-termination residual commissions, and the commission rate.

TCS, on the other hand, contends that the agreement's terms were definite and certain enough because the agreement incorporated the customs and practices of the manufacturers'

9

representative industry. Specifically, TCS claims that it is the industry custom and practice for a manufacturer's exclusive sales representative to receive a commission on a sale anywhere with the representative's territory during the period of the representation even if the representative played no role in soliciting or procuring the sale. It also claims that it is customary in the industry for a manufacturer's exclusive sales representative to receive a commission, even after termination of the representative arrangement, on sales solicited by the representative before the termination but not completed until after the termination. Because of these industry customs and practices, TCS claims Engico owes it commissions on the 2019 sales to Lawrence Paper and President Container and on the January 2020 sale to Haire which ended up selling the machine to Welch Packaging.

It is true that a contract's terms must be definite and certain enough for a court to enforce them. *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61, 65 (Ill. 1987). Terms are "sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do." *Morey v. Hoffman*, 145 N.E.2d 644, 647-48 (Ill. 1957); *accord Midland Hotel*, 515 N.E.2d at 65. However, the contract need not "provide for every collateral matter or every possible future contingency which might arise in regard to the transaction." *Morey*, 145 N.E.2d at 647-48. Parties may leave some terms out or agree to decide them later, but they must include essential terms certain enough to provide a basis to decide whether the agreement has been kept or breached. *See, e.g., Acad. Chi. Publishers v. Cheever*, 578 N.E.2d 981, 984 (Ill. 1991) (book publishing contract lacked essential terms where no provisions regarding length and content of book; date of manuscript delivery; criteria for form and content; date, style, manner, and duration of publication; and book price); *Toll Processing*

10

*Servs., LLC v. Kastalon Polyurethane Prods.*, 880 F.3d 820, 829 (7th Cir. 2018) (storage agreement lacked essential terms because did not specify duration).

Specifically with reference to a sales representative's contract, essential terms include "the commission structure, the territory, the services to be performed, the duration of the agreement and/or a termination provision." *Anderson v. Fel-Pro Chem. Prod. L.P.*, No. 95 C 4604, 1996 WL 33410082, at *6 (N.D. Ill. Dec. 19, 1996) (citing *O'Neil & Santa Claus, Ltd. v. Xtra Value Imports, Inc.,* 365 N.E.2d 316, 318 (Ill. App. Ct. 1977)). The type of services due is another essential term but it may be inferred from a contract between sophisticated and experienced businesses. *Anderson*, 1996 WL 33410082, at *6.

While the oral agreement in this case leaves some terms undecided, the essential terms are sufficient for the Court to determine whether the parties have complied with the contract. It is clear that the 2004 agreement was an agreement between TCS on the one side and Engico on the other, so the identity of the parties is determinable. As for the definiteness of the commission structure, the Court has already found the parties originally agreed to—and paid—an 8% commission and later modified that agreement to a sliding scale before the agreement was terminated. Everyone agrees the territory was North America and TCS was to provide solicitation and promotional services in good faith in furtherance of selling Engico's machines. Commissions would be paid, at a minimum, for sales in which TCS was involved in some way The parties did not agree on a duration of the arrangement, but under Illinois law, a contract without a specific duration is terminable at will by either party. *Jespersen v. 3M*, 700 N.E.2d 1014, 1016 (Ill. 1998). And while it would have been nice for the parties to have expressly discussed post-termination commissions, that would not be an essential term to have expressly included in the contract, especially where there is a custom or practice regarding residual

11

commissions after termination in the sales representative business that may or may not have been implied in the agreement. In sum, the oral contract at issue in this case has sufficient terms for the Court to enforce it.

And TCS is entitled to have it enforced at least with respect to the 2019 sale of a new machine to Lawrence Paper. Under the agreement, while TCS was the exclusive sales representative of Engico—that is, up until August 2019 when Engico informed TCS that Haire was coming in—at a minimum Engico was obligated to pay it commissions for sales to customers, like Lawrence Paper, that TCS originally introduced to Engico and worked to develop as a client. From 2012 on, that commission was determined on a sliding scale. Consequently, when Engico concluded the May 2019 sale to Lawrence Paper, a customer TCS had brought to Engico, Engico owed a sliding scale commission to TCS. TCS is entitled to summary judgment to that extent on Count I.

Any commissions based on the 2019 sale to President Container and the 2020 sale to Welch Packaging, if due, would be based on commission terms that may or may not be implied in the contract by custom and usage, as discussed below.

E.   Custom and Usage

Engico argues that in the absence of contract provisions promising TCS commissions for all sales in its sales territory—even ones in which TCS was not involved—or an arrangement for payment of post-termination commissions, contract terms on those matters cannot be implied from trade custom and usage. On the other side, TCS asserts that essentially every industry norm should be incorporated into the contract, even ones about which Engico had no reason to know or had expressly rejected. Neither party is completely correct.

Under Illinois law, when construing a contract, the Court must give effect to the intent of

the parties. *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007); *Va. Surety Co. v. N. Ins. Co. of New York*, 866 N.E.2d 149, 153 (Ill. 2007). The Court must first attempt to determine this intent solely from the plain and ordinary meaning of the contract language, which is usually the best indication of the parties' intent. *Gallagher*, 874 N.E.2d at 58; *Va. Surety*, 866 N.E.2d at 153. If the parties' intent cannot be discerned from the words of the contract, the Court may consult extrinsic or parol evidence to explain uncertain or ambiguous terms. *Gallagher*, 874 N.E.2d at 58; *Nielsen v. USAA*, 612 N.E.2d 526, 530 (Ill. App. Ct. 1993). This can include "well known, uniform, long-established and generally acquiesced" custom[1] and usage[2] in the particular industry. *Gray v. Mundelein Coll.*, 695 N.E.2d 1379, 1386 (Ill. App. Ct. 1998). "Proof of custom or usage is intended as an aid to the interpretation of the intent of the parties at the time the contract was made." *Chi. Bridge & Iron Co. v. Reliance Ins. Co.,* 264 N.E.2d 134, 139 (Ill. 1970). "If a usage exists in a particular trade of which both parties either had notice or should have had notice, it is only just and proper that their contract should be interpreted in view of the trade practice." *Id.*

      Contrary to Engico's assertions, custom and usage may be also used for more than interpreting the meaning of a contract's express words. It can also be used as a "gap-filler" to supplement terms in a commercial contract in a particular setting where the specific contract is silent on a particular issue. *See Fifteenth Ave. Christian Church v. Moline Heat*, 265 N.E.2d 405, 408 (Ill. App. Ct. 1970) ("Where no stipulation to the contrary is included in the contract,

---

[1] Illinois law states, "A 'custom' is universally defined as a long-established practice, considered as unwritten law, and resting for authority on long consent." *Creitz v. Bennett*, 182 N.E. 736, 738 (Ill. 1932); *see* 15 Ill. Law and Prac., Customs and Usages § 1.

[2] Illinois law states, "Usage is a method of dealing, adopted in a particular place or by those engaged in a particular vocation or trade, which acquires legal force, because people make contracts with reference to it." *Currie v. Syndicate Des Cultivators*, 104 Ill. App. 165, 169, 1902 WL 2155, at *2 (Ill. App. Ct. 1902).

13

the customs and usages of the trade are presumed to form a part of the contract, provided the same are known to the parties or provided the parties are chargeable with knowledge thereof."); *Rush Presbyterian St. Luke's Med. Ctr. v. Safeco Ins. Co. of Am.*, 722 F. Supp. 485, 495 (N.D. Ill. 1989); 12 Williston on Contracts, The definition and effect of usage, § 34:1 (4th ed.).  In this way, "trade usages and customs can be incorporated into a contract in order to remedy a deficiency in the agreement when the agreement obviously omits an essential provision."  12 Williston on Contracts, The incorporation of usage into a contract, § 34:3 (4th ed.).

In this case, the question of whether a custom or usage exists and whether the parties adopted such usage or custom in the contract is generally a jury question unless the facts and circumstances establishing the usage or custom are undisputed and can lead to only one conclusion.  12 Williston on Contracts, The province of the court and the jury § 34:19 (4th ed.).

So Engico is wrong that, as a matter of law, custom and usage cannot supplement an oral contract with terms not addressed in the contract.  On the contrary, whether custom and usage supplement express commission payment terms in an exclusive sales representative agreement would be up to the jury.  TCS offers the testimony of Scott Lindberg, the expert it has tendered in the manufacturers' sales representative industry, about the custom and usage with respect to commissions in exclusive sales representatives' agreements.  Engico argues that Lindberg's expertise is not within the corrugated box industry, so he cannot provide expert testimony.  It also offers its expert, Lance Head, who offers contradictory testimony specifically about the usage and custom for corrugated box sales representatives.  Whether to believe Lindberg or Head with respect to custom and usage is a question to be decided by a jury.

In sum, there was an enforceable agreement between TCS and Engico for commissions in a set amount which may or may not have also included the terms TCS claims were implied by

14

the custom and usage of the exclusive sales manufacturers' industry. If such terms were impliedly part of the agreement, it would be up to a jury whether the 2019 sale to President Container and the 2020 sale to Welch Packaging via Haire qualified for commissions under those implied terms. If those terms were not part of the agreement as custom and usage, then there may be no further commissions due at all. And until a jury decides whether commissions are due for those two sales, it cannot be determined as a matter of law whether Engico violated the Illinois Sales Representative Act, 820 ILCS 120/0.01 *et seq.*, by failing to pay those commissions in a timely manner.[3]

      F.      <u>Illinois Sales Representative Act</u>

TCS asks for summary judgment on its claim under the IRSA, 820 ILCS 120/0.01 *et seq.* The IRSA provides that where a sales representative's contract does not specify the time a business must pay a commission to the representative, the past practice between the parties will control. 820 ILCS 120/1(2)(B). Commissions due at the time a sales representative contract is terminated must be paid within thirteen days of the termination or, if commissions become due later, within thirteen days after they become due. 820 ILCS 120/2. A business that fails to comply with the thirteen-day rule is liable for three times the amount of the commission due, plus attorney's fees and court costs. 820 ILCS 120/3.

Because the Court has granted summary judgment for TCS on Count I to the extent it

---

[3] Engico raises for the first time in its response to TCS's summary judgment motion that any contract entered into in 2018 to last until 2021 is unenforceable under the Illinois statute of frauds, the Frauds Act, 740 ILCS 80/1, since it could not be performed within a year. Engico may have waived or forfeited this affirmative by not pleading it in its answer. *See Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 309 (7th Cir. 2010); Fed. R. Civ. P. 8(c)(1). Engico raised this argument at the eleventh hour in a response brief to which TCS did not have an adequate opportunity to respond in a five-page reply brief. Additionally, in light of the fact that the contract was terminable at will, as discussed above, it could have been performed within a year and was, in fact, at least partially, if not fully, performed.

relies on the 2019 Lawrence Paper sale, TCS is also entitled to summary judgment on Count II with respect to that sale. The remainder of Count II cannot be resolved until the jury determines the terms of the contract.

### G. Unjust Enrichment

In light of the Court's finding that an enforceable agreement existed, albeit with some of the terms yet to be decided, TCS cannot prevail on its unjust enrichment claim in Count IV— also called *quantum meruit* or contract implied-in-law. A plaintiff cannot recover under this theory if there is an actual contract, *see Schroeder v. Sullivan*, 104 N.E.3d 460, 472 (Ill. App. Ct. 2018) (citing *Archon Constr. Co. v. U.S. Shelter, LLC*, 78 N.E.3d 1067, 1074 (Ill. App. Ct. 2017)), and in this case, there was an enforceable oral contract, possibly supplemented with custom and usage provisions. Therefore, Engico is entitled to summary judgment on Count IV.

## IV. Conclusion

For the foregoing reasons, the Court:

- **GRANTS in part** and **DENIES in part** Engico's motion for summary judgment (Doc. 71). The motion is **GRANTED** to the extent it seeks summary judgment on Count IV, a claim for unjust enrichment or *quantum meruit*. The motion is **DENIED** in all other respects;

- **GRANTS in part** and **DENIES in part** TCS's motion for summary judgment (Doc. 77). The motion is **GRANTED** as to Count I and II to the extent they rely on commissions due from the 2019 sale to Lawrence Paper. The specific amount of the judgment will be determined after further input by the parties. The motion is **DENIED** in all other respects; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

The claims remaining for trial, which is currently scheduled for June 13, 2022, are Counts I and II (to the extent they rely on commissions due from the 2019 sale to President Container and the 2020 sale to Haire/Welch Packaging), and Count III for an accounting. The Court further **ORDERS** a telephone status conference to be held May 4, 2022, at 9:00 a.m. CDT.

The parties should call in to 618-439-7733 for the call.

**IT IS SO ORDERED.**
**DATED:  April 26, 2022**

                                              s/ J. Phil Gilbert
                                              **J. PHIL GILBERT**
                                              **DISTRICT JUDGE**